UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MIHAELA BILIOVSCHI SMITH, *Plaintiff*, v. ANTONY BLINKEN, Secretary, United States Department of State, *Defendant*. | Civil Action No. 1:18-cv-03065 (CJN) |

## MEMORANDUM OPINION

For over two years, Mihaela Biliovschi Smith worked for the State Department as a Media Outreach Assistant out of the American embassy in Yaoundé, Cameroon. Compl. ¶ 6, ECF No. 1. A series of disputes among Ms. Smith, a coworker, and embassy management resulted in Ms. Smith filing this lawsuit, which alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Compl. ¶¶ 55–60. The State Department has moved to dismiss, or alternatively, for summary judgment. *See generally* Def.'s Mot. to Dismiss & for Summ. J. ("Mot."), ECF No. 28. The Court denies the motion for reasons that follow.[1]

### I. Background

An American citizen of Romanian national origin, Mihaela Biliovschi Smith accompanied her husband Derrin Ray Smith to Yaoundé, Cameroon in August 2014.[2] *See* Joint Chronological

---

[1] In addition to denying the State Department's motion for summary judgment, this Court also denies the State Department's alternative motion to dismiss. *Tyson v. Brennan*, 306 F. Supp. 3d 365, 369 (D.D.C. 2017); *Brooks v. Kerry*, 37 F. Supp. 3d 187, 199 (D.D.C. 2014). For clarity's sake, this memorandum opinion will refer to the State Department's motion as a motion for summary judgment.

[2] This Court views the evidence in a light most favorable to Ms. Smith and draws all reasonable inferences in her favor. *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

1

Statement of Material Facts ("Joint Statement"), ECF No. 38 at ¶¶ 1–3.  Mr. Smith ventured to Africa to work as a foreign service officer with the U.S. embassy.  *Id.* ¶ 3.  During their first year in Cameroon together, Mr. and Ms. Smith attended an embassy-hosted dinner where the deputy chief of the embassy, Greg Thome, allegedly told Ms. Smith at the dinner table that her "country right now is the United States of America" and that "at the State Department, we don't work for the interests of the Romanians."  *Id.* ¶ 5.  Thome, Ms. Smith also claims, later inquired into whether she "spoke Russian."  *Id.* ¶ 13.  Ms. Smith perceived Thome's comments related to her Romanian ethnicity as odd, discomforting, and concerning.  Derrin Ray Smith Decl. ("Smith Decl."), ECF No. 31-8 at 2.  Yet neither Ms. Smith nor her husband apparently took action in response.

Early in 2015, Ms. Smith applied for a position with the embassy as a "Media Outreach Assistant."  *See* Joint Statement ¶¶ 6, 10.[3]  She got the job.  *Id.* ¶ 14.  The job offer stated that Ms. Smith would begin her employment with the embassy at an entry-level pay rate.  *Id.* ¶ 15.  Upon receipt of the offer, Ms. Smith requested that the State Department conduct a superior qualifications rate review to determine whether she qualified for higher pay.  *Id.* ¶¶ 16, 20.[4]  The assistant in the human resources department in charge of preparing Ms. Smith's hiring documents thought that Ms. Smith might qualify for a higher rate based on her "expansive knowledge" and experiential background.  *Id.* ¶ 38.

Yet a higher-level manager in the human resources department, Charles Morrill, made the decision not to submit Ms. Smith's paperwork for a superior qualifications review, *id.* ¶ 44, and when he informed her of that decision, he referenced her Romanian perspective and Balkanized

---

[3] A Media Outreach Assistant shoulders the duty of training and supporting local media.  *See* Mihaela Biliovschi Smith Dep. ("Ms. Smith's Dep."), ECF No. 32-1 at 13.

[4] If a job candidate qualifies for higher pay based on a "superior qualifications determination," Joint Statement ¶ 16, then the person could receive a superior qualification rate of pay, which compensates the individual because the employer based on the individual's experience "may reasonably expect a higher level of performance beyond the requirements of the job," *id.* ¶ 35.

mindset. *Id.* ¶ 51. When asked in his deposition to clarify these comments, Morrill stated that he knew the "mindset" of Romanians based on his experience working with "Eastern Europeans." Charles Morrill Dep. ("Morrill's Dep."), ECF No. 28-9 at 4–5. He added that people from that part of the world hold a world view that "people are out to get you." *Id.* at 5. The decision not to submit the paperwork generated conflict between Ms. Smith and embassy management. Ms. Smith nonetheless accepted the offer of employment.

A month or so after starting the job, Ms. Smith contacted the embassy's Information Management Officer, Ali Mokhtare, to voice frustration with her in-home internet connectivity. Joint Statement ¶ 54. Ms. Smith's first interaction with Mokhtare did not go well, *id.* ¶¶ 54–60, and that initial interaction led to a string of hostile communications among Mokhtare and the Smiths, which festered into multiple incidents. *Id.* ¶¶ 61–63. The series of events resulted in meetings between embassy management and Mr. and Ms. Smith. *Id.* ¶ 81.

As hostilities heated, Ms. Smith conducted an internet search regarding Mokhtare, discovering a 2005 story that discussed an accusation that Mokhtare had directed inappropriate contact at a female colleague. *Id.* ¶ 99. Ms. Smith informed her husband and some work colleagues about her discovery. *Id.* ¶ 110. She later filed reports explaining her discomfort working with Mokhtare, who at that point had started to stalk and harass her. *Id.* ¶ 111. She also called a confidential consultation service, taking the opportunity to express her discomfort about working with someone she described as a "sexual predator." *Id.* ¶ 111.

In accordance with guidance from the confidential service, Ms. Smith phoned embassy management, including Ambassador Michael Hoza, to make it known that Mokhtare was harassing her. *Id.* ¶ 114. Within weeks, Ms. Smith informed a special agent tasked with investigating the allegations that things between her and Mokhtare had intensified. *Id.* ¶ 145. She also contacted

an Equal Employment Opportunity counselor at the embassy to assist with filing a formal complaint. *Id.* ¶ 132, 150. Embassy management met with Ms. Smith on several occasions to discuss the situation, including her discovery and communication of the internet story about Mokhtare. *Id.* ¶ 152. During the meetings, Ms. Smith voiced her concerns and made suggestions to ameliorate the situation. *Id.* ¶ 156.

Ms. Smith engaged in mediation a few days after one of the meetings. *Id.* ¶ 163. The mediation concluded without resolution. *Id.* ¶ 166. Within the hour, embassy management emailed Ms. Smith a written counseling memo, which rehashed previous discussions and requested that all involved maintain minimum contact. *Id.* ¶ 167. It also directed Ms. Smith to "not make allegations of criminal conduct" about Mokhtare to "members of the Embassy community or outside" the embassy. *Id.* ¶ 169. Ms. Smith interpreted the statement as a "gag order," attempting to stop her from reporting on the workplace environment and Mokhtare's conduct. *Id.* ¶ 173.

Ms. Smith claims that, shortly before Thome left his position with the embassy, he left "turnover notes" to his successor and Ms. Smith's future supervisor. *Id.* ¶ 183. Those notes cast Ms. Smith in a negative light. Ms. Smith also claims that the notes caused Thome's successor to instruct others on ways to avoid speaking with Ms. Smith out of fear that she could "incriminate" them into providing more "ammo," "dirt," or "evidence of her mistreatment" for her complaint. Pl.'s Mem. in Opp'n to Mot. for Summary J., ECF No. 30 at 17. Ms. Smith alleges that the notes coupled with past conduct by embassy management spurred her to file a complaint with the Office of the Inspector General, alleging that Thome "engaged in reprisal, intimidation, as well as harassment as a result of my bringing up concerns regarding threats received from a fellow employee of the Department." Joint Statement ¶ 183. She also filed a formal complaint of sex discrimination, national origin discrimination, and unlawful retaliation. *Id.* ¶ 177.

In December 2018, Ms. Smith filed this lawsuit against her employer for discrimination and for creating a retaliatory and a hostile work environment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Compl. ¶¶ 55–60. The State Department has moved to for summary judgment on all of Ms. Smith's claims.

## II.     The Summary Judgment Standard

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "genuine" dispute about a material fact does not exist unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party has met its burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252.  In other words, "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Id.*

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255).  Yet "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [her] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Baylor v. Powell*, 459 F. Supp. 3d 47, 53 (D.D.C. 2020) (quotation omitted). As "conclusory allegations" and "unsubstantiated speculation" will not suffice to create genuine issues of material fact, "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 143, 149 (D.D.C. 2020) (quotation omitted).

### III.   Claim of Unlawful Discrimination Under Title VII

Section 703(a)(1) of Title VII makes it an "unlawful employment practice" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Claims of unlawful discrimination in violation of Title VII "may be proven by direct or circumstantial evidence." *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 394 (D.C. Cir. 2020). To establish a *prima facie* discrimination claim with indirect evidence, a plaintiff must show that (1) she falls within a protected category, (2) she suffered an adverse employment action, (3) and the unfavorable action gives rise to an inference of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006).

Absent direct evidence, discrimination claims proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (clarifying that where a plaintiff produces direct evidence, she "may prevail without proving all the elements of a prima facie case."). Once a plaintiff

6

establishes a *prima facie* case, the burden shifts to the employer to articulate some legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action. *McDonnell Douglas*, 411 U.S. at 802. This burden is "one of production" in which an employer must produce evidence "sufficient for the trier of fact to conclude" that the action was taken for the provided reason. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 854 (D.C. Cir. 2006). An employer's explanation for the challenged action must be "clear and reasonably specific." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

When the employer proffers a clear and specific reason, the "central question" at summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted rationale amounts to a pretext. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing *St. Mary's*, 509 U.S. at 507). Whether evidence proffered to show pretext suffices to raise an inference of unlawful discrimination or retaliation is a fact-sensitive inquiry. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998); *Walker v. Johnson*, 798 F.3d 1085, 1091–92 (D.C. Cir. 2015) (identifying the following factors that may support an inference of pretext: the employer's (1) preferential treatment of similarly situated employees outside the plaintiff's protected group; (2) inconsistent or dishonest explanations; (3) deviation from established procedures or criteria; (4) pattern of poor treatment of other employees within the same protected group as the plaintiff; (5) the temporal proximity between an employee's protected activity and the employer's adverse action; and (6) other relevant evidence that a jury could consider to reasonably conclude the employer acted with an illicit motive).

Ms. Smith's Title VII discrimination claim boils down to whether she suffered a discriminatory adverse employment action on the basis of her national origin. Sufficient

circumstantial evidence exists for a reasonable juror to conclude that Ms. Smith suffered unlawful discrimination when the State Department established her pay level and declined to submit a superior qualifications review on her behalf. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).[5]

According to Ms. Smith, embassy management made frequent reference to her Romanian origin before and throughout her employment, including in the context of establishing her starting pay level. The deputy chief of the embassy, Greg Thome, for instance, allegedly made remarks about Ms. Smith's accent months before she assumed her role with the embassy. As noted above, after learning of Ms. Smith's Romanian ethnicity, Thome told her during an embassy-hosted dinner that her "country right now is the United States of America" and "at the State Department, we don't work for the interests of the Romanians." Joint Statement at ¶ 5. Thome, Ms. Smith also claims, inquired into whether she "spoke Russian" soon after she interviewed for the job. *Id.* ¶ 13. The thrust of Ms. Smith's evidence of discrimination on the basis of her national origin, however, arises from statements made after she assumed her position.

In particular, soon after Ms. Smith received her employment offer, she requested that a superior qualifications rate review to determine whether she qualified for higher pay. *Id.* ¶ 20. The human resources assistant in charge of preparing Ms. Smith's hiring documents thought that Ms. Smith might qualify for a higher rate based on her "expansive knowledge" and experiential background. *Id.* ¶ 38. Yet according to Ms. Smith, Thea Wargowsky, an employee in the human

---

[5] This Court concludes that embassy management's comments about Ms. Smith's Romanian ethnicity do not constitute direct evidence of discrimination, but rather may "be probative of discrimination" under the burden-shifting framework in place for claims reliant on indirect evidence of discrimination. *Isse v. Am. Univ.*, 540 F. Supp. 2d 9, 30 (D.D.C. 2008); *Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C. 2006) (noting that "direct evidence does not include stray remarks in the workplace"). In addition, Ms. Smith's contention that she received lower pay based in part on her national origin satisfies the requirement that a Title VII discrimination plaintiff show that she suffered an adverse employment action. *See* 42 U.S.C. § 2000e-2(a)(1) (making it unlawful to discriminate with respect to "compensation"); *Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001).

resources department, informed her that the department had "evaluated your information against superior qualifications and it failed based on salary history and education." *Id.* ¶ 41. The next day, Ms. Smith emailed Charles Morrill, a higher-level manager in the human resources department, stating that "[t]here is no way that [my pay level] is appropriate given my expertise and awards." *Id.* ¶ 44. After receiving the email, Morrill expressed an opinion that Ms. Smith should be given "some credit for her extensive experience and [that he] would recommend" increasing her pay. *Id.* ¶ 48.

After an internal discussion, Wargosky voiced a willingness to submit the request for a review. *Id.* ¶ 49. But Morrill decided against it, informing Wargosky that he would let Ms. Smith know of the decision not to submit her request. *Id.* ¶ 51. When he communicated the decision to Ms. Smith, Morrill referred to Ms. Smith's Romanian perspective and Balkanized mindset. *Id.* When later asked to clarify the comments, Morrill stated that he knew the "mindset" of Romanians based on his experience working with "Eastern Europeans." Morrill Dep. at 4–5. He added that people from that part of the world hold a world view that "people are out to get you." *Id.* at 5.

These statements, leading up to and during the process of establishing her pay level and rejecting her superior qualifications rate request, provide sufficient evidence from which a jury could conclude that Ms. Smith suffered unlawful discrimination on the basis of her national origin in violation of Title VII. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 571 (D.C. Cir. 2019); *Raymond v. Architect of Capitol*, 49 F. Supp. 3d 99, 113 (D.D.C. 2014) (noting that discriminatory comments may raise an inference of discrimination or pretext). The statements about Ms. Smith's national origin taken as a whole, in other words, permit a jury to infer discrimination or pretext based on the statements made and that she may not have received a superior qualifications rate review (and a possible accompanying pay increase) based in part on her Romanian ethnicity.

9

*Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (finding material adversity when employee's performance evaluation "affect[s] the employee's 'position, grade level, salary, or promotion opportunities'")); *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016).

The State Department's contention that Morrill's statements have been taken out of context do not eliminate the inference a jury could draw of discriminatory decision-making. Morrill's statements, in the State Department's view, amount to nothing more than a career diplomat preparing to inform someone of tough news and an effort at trying to "see things from another person's perspective and use his experience with foreign cultures to make a difficult conversation easier." Mot. at 7; *see* Def.'s Reply to Opposition to Mot. Dismiss & for Summ. J. ("Def's Reply"), ECF No. 36 at 5. That may very well be the case, but that reading of the record grants Morrill too much benefit of the doubt at this stage of litigation. A jury, not a judge, gets to decide the meaning and motivations behind Morrill's statements. *Reeves*, 530 U.S. at 150 (internal quotations omitted) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

The State Department's arguments regarding why it declined to submit a superior qualifications rate review on behalf of Ms. Smith also do not compel the grant of summary judgment. *See Figueroa v. Pompeo*, 923 F.3d 1078, 1094 (D.C. Cir. 2019). It contends that no applicant or employee is entitled to a superior qualifications rate review, that setting a higher pay level is a matter of management discretion, and that management "exercised that discretion and made a reasonable decision that pursuing an [superior qualifications rate review] was not an efficient use of resources." Def's Reply at 8–9. But the discretion baked into the superior qualifications rate review process leaves ample room for discriminatory motivations to sway

10

decision-making. The State Department further asserts that based on Ms. Smith's inexperienced background and limited qualifications she was "unlikely" to receive approval for higher pay even if management submitted the request. Mot. at 7. Yet the adverb "unlikely" acknowledges a path remained viable. Indeed, Ms. Smith had previous experience that put her in the running for approval. Morrill's own statement in which he voiced his opinion that Mr. Smith deserved higher pay based on her "extensive" experience suggests as much. *See* Joint Statement at ¶ 48.

State also argues that submitting a superior qualifications rate review for Ms. Smith would delay her start date, and is thus a legitimate, non-discriminatory reason. Mot. at 7–8. But the record suggests that a superior qualifications rate review could have been processed in as little as 10 days. *See* Thea Wargowsky Dep., ECF No. 31-4 at 35. Given the record evidence, there is at least a question regarding whether this proffered reason is pretextual.

The record also reflects that comparators may have been treated differently. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016) (discussing factors that make a colleague an appropriate comparator). Embassy management submitted a superior qualifications rate review for an non-Romanian employee just months before Ms. Smith started her job, and that employee received approval and a pay raise. *See* Joint Statement at ¶ 53. Although perhaps insufficient on its own to survive summary judgment, this evidence bolsters Mr. Smith's arguments that the State Department's proffered explanations are mere pretext.

### IV.    Claims of Hostile Work Environment Under Title VII

In addition to prohibiting unlawful discrimination, Title VII also prohibits employers from creating or condoning a hostile or abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (holding that Title VII makes it unlawful for an employer to require "people to work in a discriminatorily hostile or abusive environment"). A plaintiff asserting a hostile work

environment claim must show that her employer subjected her to "discriminatory intimidation, ridicule, and insult'" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* An "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). The Court looks to the "totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance" to determine whether a hostile work environment exists. *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008); *Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017). Sporadic incidents of rude or unprofessional behavior will not give rise to a claim—severe or pervasive means just that. *Barbour v. Browner*, 181 F.3d 1342, 1348–49 (D.C. Cir. 1999).

Working in a severe or pervasive hostile "environment can also support a claim of retaliation under Title VII." *Fields v. Vilsack*, 207 F. Supp. 3d 80, 92 (D.D.C. 2016); *Wise v. Ferriero*, 842 F. Supp. 2d 120, 125 (D.D.C. 2012) (noting that a "hostile work environment can amount to either discrimination or retaliation under Title VII"). A provision of Title VII separate from the discrimination provision provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has made a charge." 42 U.S.C. § 2000e–3(a). That distinct-retaliation provision supports a "special type of retaliation claim based on a hostile work environment by alleging a series of individual acts that may not be actionable on [their] own but become actionable due to their cumulative effect." *Menoken v. Dhillon*, 975 F.3d 1, 5–6 (D.C. Cir. 2020) (quotation omitted); *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015). The acts giving rise to the claim "must be both adequately linked such that

they form a coherent hostile environment claim, and of such severity or pervasiveness as to alter the conditions of . . . employment and create an abusive working environment." *Menoken*, 975 F.3d at 6 (quotation omitted).[6] Courts will "often consider whether the acts in question involve[d] the same type of employment actions, occur[ed] relatively frequently, and [were] perpetrated by the same managers" to decide whether a group of alleged acts is sufficiently linked. *Id.* (quotation omitted).

Ms. Smith asserts that her employer subjected her to a hostile work environment based on her sex, national origin, and engagement in protected activity. Though Ms. Smith's allegations regarding unlawful discrimination on the basis of national origin suffice to move her Title VII *discrimination* claim past the State Department's motion for summary judgment, *see* Part III, the record does not support a *hostile work environment* claim on the basis of her Romanian ethnicity. Ms. Smith has failed to proffer any real evidence that embassy management or staff created a severe and pervasive work environment because of her national origin: She does not point to a

---

[6] The Court pauses to note that the circuits appear split over what standard applies to retaliatory hostile work environment claims. Unlike claims of unlawful discrimination, a plaintiff bringing a claim for unlawful retaliation under Title VII need not show that a retaliatory action affected the employee's "terms, conditions, or privileges of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). A Title VII retaliation plaintiff instead must show that "a reasonable employee would have been 'dissuaded . . . from making or supporting a charge of discrimination.'" *Id.* at 68. Given the different standards used for discrimination and retaliation claims under Title VII, some confusion exists over whether "the same standard applies to both discriminatory and retaliatory hostile work environment claims." *Fields v. Vilsack*, 207 F. Supp. 3d 80, 92 (D.D.C. 2016); *see also Jones v. Granholm*, No. CV 20-0472 (CKK), 2021 WL 2530677, at *13 (D.D.C. June 21, 2021); *Miles v. Kerry*, 961 F. Supp. 2d 272, 294 (D.D.C. 2013); *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 81 (D.D.C. 2013) (unpacking the confusion); *Davis v. Yellen*, No. 08-CV-447 (KBJ), 2021 WL 2566763, at *17 n.20 (D.D.C. June 22, 2021) (same). Even in light of the Supreme Court's decision in *Burlington Northern*, the Court of Appeals appears to continue to incorporate language from the text of Title VII's distinct discrimination provision into the standard used for retaliatory hostile work environment claims. *Menoken v. Dhillon*, 975 F.3d 1, 6 (D.C. Cir. 2020); *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015); *see also Komis v. Sec'y of United States Dep't of Lab.*, 918 F.3d 289, 299 n.9 (3d Cir. 2019) (observing that several circuits, including the D.C. Circuit, "continue to ask whether the claimant's workplace is permeated with conduct severe or pervasive enough to change the conditions of the claimant's employment in reviewing Title VII retaliatory hostile work environment cases after *Burlington Northern*"). The relevant standard, however, may prove academic in practice given that a plaintiff must still demonstrate that the environment has become sufficiently "severe or pervasive." *Fields v. Vilsack*, 207 F. Supp. 3d 80, 93 (D.D.C. 2016).

string of acts taken on the basis of her Romanian ethnicity that together form a coherent hostile environment claim.

But Ms. Smith also relies on her sex and her engagement in protected activity as a basis for her claim. Courts in this circuit analyze a claim for hostile work environment based on both sexual harassment and retaliation as two distinct claims. *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 69 (D.D.C. 2013) (analyzing a claim for hostile work environment based on sexual harassment and retaliation as two distinct claims); *Langley v. Napolitano*, 677 F. Supp. 2d 261, 266 (D.D.C. 2010) (doing something similar). The Court will do the same, addressing Ms. Smith's hostile work environment claim as two distinct claims: one for sex-based harassment and the other for retaliation.

*Ms. Smith's hostile work environment claim on the basis of sex-based harassment.* Ms. Smith's allegations with respect to Mokhtare's workplace conduct and embassy management's response to that conduct provide sufficient evidence from which a jury could conclude that she labored in a hostile work environment. *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 9 (D.D.C. 2011). According to Ms. Smith, Mokhtare started the alleged harassment of her with a refusal to directly address her. That initial incident escalated into a verbal threat. Ms. Smith, supported with a declaration from Mr. Smith, *see* Smith Decl. at 2, asserts that Mokhtare called her husband's cellphone to threaten her about complaints she made regarding poor in-home internet connection, *id.* Mokhtare allegedly stated in an inebriated tone that he was "not going to take any more crap from your wife," that he could not tolerate Ms. Smith, and that her husband had to keep her under control. Ms. Smith's Dep. at 18.

The workplace environment only worsened from that point forward. After a friend of Ms. Smith's mentioned Mokhtare's alleged checkered past, Ms. Smith conducted an internet search of

him. *Id.* at 19. She found news clips about an alleged incident from 2005 involving inappropriate conduct between Mokhtare and a female contractor in Iraq. *Id.* Those findings combined with Mokhtare's threats and harassing behavior spurred Mr. Smith to report her findings as well as Mokhtare's alleged ongoing harassment to embassy management. *Id.* at 27.

Embassy management's reaction to Ms. Smith's reports of harassment further deteriorated the work environment. Ms. Smith alleges that her male supervisors encouraged her to go home and drink wine with her husband despite her concerns, and that they allegedly called her irrational as well as paranoid. *See* Joint Statement at ¶¶ 92, 114. Ms. Smith also asserts that Mokhtare took advantage of management not taking steps to rectify the situation. In the wake of verbal threats, Ms. Smith claims that she worked at the office in constant fear of Mokhtare because he had amplified his unwelcomed behavior. *Id.* ¶ 149. She also contends that Mokhtate made menacing faces, glanced intimidating stares, and stalked her at work all despite management's awareness of the alleged ongoing harassment. *See* Ms. Smith's Dep. at 22.

In short, Ms. Smith has put forth sufficient evidence from which a jury could conclude that she worked in a hostile environment and suffered unlawful discrimination as a result. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998). Looking at the totality of the circumstances, including Mokhtare's frequent harassing conduct and threats, as well as embassy management's inadequate response to alleviating the environment, the Court concludes that "a reasonable jury could find that the harassment here was 'sufficiently severe or pervasive to alter the conditions of' her employment." *Ashraf-Hassan v. Embassy of France in United States*, 999 F. Supp. 2d 106, 113 (D.D.C. 2013).

The State Department argues that even if Ms. Smith dealt with the occasional hostile interaction she did not work in a severe or pervasive environment that altered her work conditions.

15

To put the point differently, the State Department contends that "none of the actions alleged to have created a hostile work environment involve anything but disagreements between Ms. Smith and management." Mot. at 11. Yet both an objective and a subjective analysis of the situation suggests a different reality (or at least that a jury could reach a different conclusion). *Gray v. Foxx*, 637 F. App'x 603, 608 (D.C. Cir. 2015) (noting that the test for severity and pervasiveness undergirding a hostile work environment claim "is an objective one"). Ms. Smith claims that out of fear of being left alone in the office with Mokhtare, she avoided working out at the embassy's gym, evaded the common areas where she might encounter Mokhtare, developed anxiety and other ailments, and gave up working late hours. *See* Ms. Smith's Dep. at 25. She argues, and a jury could conclude, that she in essence lost the ability to take advantage of the *privileges* and *conditions* that accompany employment. *See Threat v. City of Cleveland, Ohio*, 2021 WL 3140525, at *3–5 (6th Cir. 2021) (unpacking the broad scope of the terms *privileges* and *conditions* of employment).

The State Department also argues that Ms. Smith cannot establish a causal connection between her protected status and the work environment. But the record supports the inference that a "common thread" connects Ms. Smith's status as a female to the hostile work environment created by Mokhtare's alleged inappropriate conduct and embassy management's alleged failure to respond in a sufficient manner. *Davis v. Yellen*, No. 08-CV-447 (KBJ), 2021 WL 2566763, at *18 (D.D.C. June 22, 2021); *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 836 (11th Cir. 2021) (noting that a hostile work environment claims requires something less than but-for causation linking the hostile work environment to the employee's protected characteristic). Ms. Smith paints a picture of an environment where time and again embassy management failed to respond in a proper manner to her reports that Mokhtare had threatened her and continued to

engage in threatening and stalking behavior causing her distress. The totality of the circumstances in light of disputed material facts permit Ms. Smith's hostile work environment claim based on her sex to proceed past the State Department's motion for summary judgment.

*Ms. Smith's retaliatory hostile work environment claim.* The record shows that Ms. Smith engaged in protected activity when she reported on several occasions Mokhtare's allegedly unlawful conduct to embassy management. *Sargent v. Pompeo*, No. 1:19-CV-00620 (CJN), 2020 WL 5505361, at *9 (D.D.C. Sept. 11, 2020). So this retaliatory hostile work environment claim turns on whether embassy management took a series of acts based on Ms. Smith's engagement in protected activity sufficient to create a hostile work environment. *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012). Ms. Smith's allegations with respect to embassy management's response to her engagement in protected activity provide sufficient evidence from which a jury could conclude that she suffered unlawful retaliation in violation of Title VII.

Ms. Smith met with management on three occasions within a month span. *See* Joint Statement at ¶¶ 22–56. During the meetings, Ms. Smith sought help from management as a result of Mokhtare's threatening and stalking behavior. Ms. Smith claims that, hours after she contacted the Equal Employment Opportunity counselor about Mokhtare and about how to file a formal complaint, management set up a counseling session to discuss her reports about Mokhtare. *Id.* ¶ 150. The session led Thome to produce a written counseling memo directing Ms. Smith to "not make allegations of criminal conduct" about Mokhtare to "members of the Embassy community or outside" the embassy. *Id.* ¶ 169. Ms. Smith perceived the memo as a "gag order," limiting whom she could contact about the situation in her workplace. *Id.* ¶ 173.

Ms. Smith claims that, shortly before Thome left his position, he left "turnover notes" to his successor and Ms. Smith's future supervisor. *Id.* ¶ 183. The alleged turnover notes cast Ms.

Smith in a negative light. Ms. Smith also claims that the notes caused Thome's successor to instruct others on ways to avoid speaking with Ms. Smith out of fear that she could "incriminate" them into providing more "ammo," "dirt," or "evidence of her mistreatment" for her complaint. Pl.'s Mem. in Opp'n to Mot. for Summary J., ECF No. 30 at 17. Ms. Smith alleges that the notes coupled with past conduct by embassy management spurred her to file a complaint with the Office of the Inspector General, alleging that Thome "engaged in reprisal, intimidation, as well as harassment as a result of my bringing up concerns regarding threats received from a fellow employee of the Department." *Id.* ¶ 183.

To top it off, Ms. Smith claims that management took tangible employment actions against her because of her engagement in protected activity. *Vance v. Ball State Univ.*, 570 U.S. 421, 430 (2013). She claims, for instance, that management denied her request to perform Equal Employment Opportunity counseling duties, deprived her of a performance Mission Honor Award for which she was nominated, and torpedoed her effort to achieve security clearance. *See* Joint Statement at ¶¶ 212–231. The alleged deprivation of these benefits of employment, taken with the other evidence in the record, is sufficient for a jury to conclude that Ms. Smith was subjected to a retaliatory hostile work environment claim.

## V.   Conclusion

Because a reasonable juror could find, based on the present record, that Ms. Smith suffered discrimination on the basis of national origin and that she was subjected to a hostile work environment on the basis of her sex and her engagement in protected activity, it would be inappropriate to grant the pending Motion for Summary Judgment. The State Department's Motion for Summary Judgment is therefore Denied. An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  August 24, 2021

CARL J. NICHOLS
United States District Judge